IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NAUTILUS INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 22-cv-5007 |
| GRAND DEVELOPMENT GROUP, LLC; and | ) | |
| 1649-59 GRAND/469 PAULINA | ) | |
| CONDOMINIUM ASSOCIATION, | ) | |
| | ) | |
| Defendants. | | |

## COMPLAINT FOR DECLARATORY JUDGMENT

NOW COMES Plaintiff, NAUTILUS INSURANCE COMPANY ("Nautilus"), by and through its attorneys, Dana A. Rice and Jeremy Macklin of Traub Lieberman Straus & Shrewsberry, LLP, and for its Complaint for Declaratory Judgment against Defendants, GRAND DEVELOPMENT GROUP, LLC ("Grand Development") and 1649-59 GRAND/469 PAULINA CONDOMINIUM ASSOCIATION (the "Association"), it states as follows:

## THE PARTIES

1.     Nautilus is, and at all relevant times has been, a corporation organized under the laws of Arizona with its principal place of business in Scottsdale, Arizona.

2.     Grand Development is, and at all relevant times was, a limited liability company organized under the laws of Illinois with its principal place of business located in Northbrook, Illinois. On information and belief, the sole member of Grand Development is Alex Troyanovsky, a resident of Illinois, and therefore a citizen of Illinois.

3.     The Association is, and at all relevant times was, a not-for-profit corporation organized under the laws of Illinois with its principal place of business in Illinois.

## JURISDICTION

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between the plaintiff and the defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

## VENUE

5.      Venue is proper pursuant to 28 U.S.C. §1391(b) (1) and (2) because at least one defendant resides in this judicial district. Moreover, a substantial part of the events giving rise to this litigation occurred in this judicial district. Specifically, the incident giving rise to the underlying lawsuit occurred in Chicago, Illinois, and the underlying lawsuit at issue in this declaratory action is currently pending in the Circuit Court of Cook County, Illinois.

## THE UNDERLYING LAWSUIT

6.      On April 27, 2021, the Association filed a lawsuit against Grand Development in the Circuit Court of Cook County, Illinois under case No. 2021L004315 captioned *1649-59 Grand/469 Paulina Condominium Association v. Grand Development Group, LLC* (hereinafter the "*Association* Lawsuit").

7.      The operative pleading in the *Association* Lawsuit is a Complaint (the "Underlying Complaint"). A true and accurate copy of the Underlying Complaint filed in the *Association* Lawsuit is attached hereto as **Exhibit A** and incorporated herein by reference.

8.      The *Association* Lawsuit was brought by the Association's Board of Directors (the "Board") on behalf of the individual condominium unit owners. *Id.*, ¶2.

9.      The Underlying Complaint alleges that Grand Development was the developer of "a modern, luxury condominium building" located at 469 N. Paulina Avenue in Chicago, Illinois (the "Building"). Ex. A, ¶¶1-2.

10.     The Underlying Complaint alleges that Grand Development sold the Building's condominium units to individual unit owners in 2017 and 2018. Each owner signed a purchase agreement prepared by Grand Development requiring Grand Development to remedy "Punch List Items" ("Purchase Agreements").  *Id.*, ¶¶12-13.

11.     The Underlying Complaint alleges that, while all owners provided Grand Development with Punch List Items in accordance with the terms of the Purchase Agreements, Grand Development failed to address all of the identified items. *Id.*, ¶15.

12.     The Underlying Complaint sets forth the following timeline of events related to the Punch List Items:

- September 20, 2017: Prior to their closing on this date, owners Alfonso Sebastian and Kathrin Otero Barba (through their attorneys) identified Punch List Items to Grand Development.

- January 29, 2018: Prior to their March 22, 2018 closing, owners Pinak Dash and Piyanka Vyas (through their attorneys) sent a letter to counsel for Grand Development identifying Punch List Items. The Underlying Complaint alleges that certain Punch List Items submitted by Dash and Vyas were not addressed prior to closing.

- April 3, 2018: Prior to their closing on this date, owners Brandon and Weiyi Miller (through their attorneys) identified Punch List Items to Grand Development.

- July 19, 2018: Sebastian and Barba sent an email to their realtors about outstanding Punch List Items, which the realtors forwarded to counsel for Grand Development.

- September 27, 2018: At a Board meeting at which Grand Development or its agents were in attendance, the Board enlisted owner Daniel D'Angelo to organize all of the owners' Punch List Items into a single spreadsheet.

- November 29, 2018: At a Board meeting at which Boris Lehtman (as an actual or apparent agent of Grand Development) was in attendance, the Board decided that Lehtman would submit the Punch List Items to Grand Development.

- December 28, 2018: The Millers sent an email to Velina Veleva, an agent of Grand Development, about the outstanding Punch List Items. The Complaint alleges that Veleva responded saying, "[w]e have your punch list and shortly someone will be fixing the items on it. Please give us a few more weeks."

- February 19, 2019: Punch List Items were discussed at a Board meeting at which Lehtman was present.

- March 11, 2019: The Millers sent an email to counsel for Grand Development asking that Grand Development address the Punch List Items and the "defectively constructed roof" pursuant to the limited warranty.

- May 7, 2019: Incomplete Punch List Items were discussed at a Board Meeting at which Lehtman was present. Lehtman allegedly stated that all Punch List Item requests should be sent to Igor Michin, the general contractor, and then to Veleva and Shone Citic as agents of Grand Development.

- June 1, 2019: Dash followed up via email with Veleva about outstanding Punch List Items.

- June 4, 2019: Dash followed up again via email with Veleva about outstanding Punch List Items.

- June 27, 2019: The owners sent a combined list of Punch List Items to Michin via email.

- February 4, 2020: Dash sent emails to Veleva and counsel for Grand Development about outstanding Punch List Items. Counsel for Grand Development responded that Dash should contact Citic about the outstanding items.

- February 6, 2020: Dash sent an email to Citic about outstanding Punch List Items.

*Id.*, ¶¶17-24.

13. The Underlying Complaint alleges that in exchange for each owner's agreement to waive the implied warranty of habitability, Grand Development provided a one-year limited warranty ("Limited Warranty") applicable to "defects arising out of faulty workmanship or materials [. . .]." Specifically, Grand Development warranted that the roof, exterior, doors, etc., were free of defects in materials and workmanship. The Limited Warranty was attached to each Purchase Agreement. *Id.*, ¶¶25-31.

14. The Underlying Complaint alleges that in early 2018, during the first winter storm since the initial sale of the units, unit owners on the fourth floor began reporting water intrusion from the ceiling of their units. *Id.*, ¶33.

4

15.     The Underlying Complaint sets forth the following timeline of events related to the alleged water damage issues from the winter storm:

- January 9, 2018: Owner D'Angelo advised Jerry [no last name provided], an agent of Grand Development, of water intrusion in his unit.

- Late January 2018: Someone determined that the water intrusion "was caused by a defectively constructed roof."

- January 25, 2018: Owners held a meeting with Grand Development (including Veleva and Citic) to discuss the defectively constructed roof and other defects in the Building. At the time of this meeting, Grand Development ran the Board.

- February 2, 2018: Owners Shab Seddigh and Bryan Hargrove wrote to Veleva that the roof "was of the utmost priority" and needed to be addressed. Veleva responded on February 5, 2018 writing that she was "not in a position to comment any further on the issue at hand."

- May 21, 2018: D'Angelo advised Jerry of a leak in the common area of the fourth floor near the elevator.

- January 19, 2019: The Millers sent an email to Veleva and Lehtman about water intrusion from the roof and bubbling paint in their unit.

- February 1, 2019: The Millers sent a follow-up email to Veleva and Lehtman about water intrusion in their unit.

- February 7, 2019: Lehtman wrote to the owners about the water leaks and the status of Grand Development's investigation into the source of the leaks.

- May 7, 2019: Lehtman advised the owners that Grand Development was committed to fixing the roof to address what was determined to be a condensation issue.

*Id.*, ¶¶35-50.

16.     The Underlying Complaint alleges that Grand Development did not fix the roof issue and the Association hired Thornton Tomasetti, an engineering consulting firm, to inspect the Building. *Id.*, ¶¶51-52.

17.     The Underlying Complaint alleges that Thornton Tomasetti visited the Building on October 7, 2020 and observed various types of damage. In addition to items of damage to individual units, Thornton Tomasetti observed that the constructed roof "substantially deviated

from architectural drawings." Specifically, "the building roof was designed as a warm roof system [in which] spray foam insulation is applied directly to the underside of the roof sheathing, which insulates the roof and also acts as a vapor retarder. The space interior to the spray foam insulation is maintained at the interior temperature." Thornton Tomasetti observed, however, that Grand Development constructed the roof "as a cold roof system" and the roof system was defectively constructed. *Id.*, ¶¶53-65.

18.     The Underlying Complaint asserts causes of action against Grand Development for: I) Breach of Contract; II) Breach of Express Warranty; and, III) Promissory Estoppel (Plead in the Alternative to Breach of Contract and Breach of Express Warranty). *See generally id.*, Counts I-III.

19.     Count I of the Underlying Complaint alleges that Grand Development breached the Purchase Agreements when it failed to remedy the Punch List Items and that Grand Development's failure to address the Punch List Items also constitutes a breach of the covenant of good faith and fair dealing. *Id.*, Count I, ¶¶73-78.

20.     Count II of the Underlying Complaint alleges that Grand Development breached the Limited Warranty "by failing to repair or replace the defective roof, downspouts, doors, windows, masonry, and building exterior" and that Grand Development breached the covenant of good faith and fair dealing implied in the Limited Warranty. *Id.*, Count II, ¶¶86-87.

21.     Count III of the Underlying Complaint alleges that Grand Development made promises to remedy the Punch List Items and made representations about the quality of the construction, materials, and workmanship related to the Building. In reliance on those promises which Grand Development failed to fulfill, Count III alleges that the unit owners purchased their units. *Id.*, Count III, ¶¶91-96.

22.     The Underlying Complaint seeks a judgment against Grand Development for hiring inspectors, the cost to repair or replace the defective roof, downspouts, doors, windows, masonry, and the cost to complete or correct Punch List Items as well as attorneys' fees and costs of suit. *Id.*, ¶¶79-97.

## **THE NAUTILUS POLICIES**

23.     Nautilus issued five consecutive year-long commercial lines insurance policies to Grand Development, which were in effect from October 24, 2014 to October 24, 2019 (collectively, the "Nautilus Policies").

24.     The first Nautilus Policy, bearing policy number NN491315, was effective from October 24, 2014 to October 24, 2015 ("the 14-15 Policy"). The 14-15 Policy, subject to its terms and conditions, provided liability limits of $1 million per occurrence and $2 million in the aggregate. A true and accurate copy of the 14-15 Policy is attached hereto as **Exhibit B** and incorporated herein by reference.

25.     The second Nautilus Policy, bearing policy number NN548751, was effective from October 24, 2015 to October 24, 2016 ("the 15-16 Policy"). The 15-16 Policy, subject to its terms and conditions, provided liability limits of $1 million per occurrence and $2 million in the aggregate. A true and accurate copy of the 15-16 Policy is attached hereto as **Exhibit C** and incorporated herein by reference.

26.     The third Nautilus Policy, bearing policy number NN682853, was effective from October 24, 2016 to October 24, 2017 ("the 16-17 Policy"). The 16-17 Policy, subject to its terms and conditions, provided liability limits of $1 million per occurrence and $2 million in the aggregate. A true and accurate copy of the 16-17 Policy is attached hereto as **Exhibit D** and incorporated herein by reference.

27. The fourth Nautilus Policy, bearing policy number NN749253, was effective from October 24, 2017 to October 24, 2018 ("the 17-18 Policy"). The 17-18 Policy, subject to its terms and conditions, provided liability limits of $1 million per occurrence and $2 million in the aggregate. A true and accurate copy of the 17-18 Policy is attached hereto as **Exhibit E** and incorporated herein by reference.

28. The final policy Nautilus issued to Grand Development, bearing policy number NN928196, was effective from October 24, 2018 to October 24, 2019 ("the 18-19 Policy"). The 18-19 Policy, subject to its terms and conditions, provided liability limits of $1 million per occurrence and $2 million in the aggregate. A true and accurate copy of the 18-19 Policy is attached hereto as **Exhibit F** and incorporated herein by reference.

<u>**COUNT I**</u>
<u>**NO COVERAGE UNDER THE POLICIES**</u>

29. Nautilus adopts and realleges the allegations in Paragraphs 1 through 28 of its Complaint for Declaratory Judgment as and for Paragraph 29 of Count I of its Complaint for Declaratory Judgment as if fully set forth herein.

30. The Policies provide, in relevant part, the following with respect to the liability coverage afforded therein:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**
* * *
**SECTION I- COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.    Insuring Agreement**

   **a.**    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any

8

"suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.

\* \* \*

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

\* \* \*

31. The Policies define the terms "occurrence" and "property damage" as follows:

**SECTION V – DEFINITIONS**

\* \* \*

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

\* \* \*

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physical injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

\* \* \*

32. To trigger coverage under the Policies, the Underlying Complaint must allege "property damage" caused by an "occurrence" during the policy period.

33. The Underlying Complaint alleges that all owners provided Grand Development with Punch List Items in accordance with the terms of the Purchase Agreements, which Grand Development failed to address. Ex. A., ¶15.

34.     Count I of the Underlying Complaint asserts a breach of contract claim, alleging that Grand Development breached the Purchase Agreements when it failed to remedy the Punch List Items *Id.*, Count I, ¶¶73-78.

35.     Count II of the Underlying Complaint alleges that Grand Development breached the Limited Warranty "by failing to repair or replace the defective roof, downspouts, doors, windows, masonry, and building exterior." *Id.*, Count II, ¶¶86-87.

36.     Count III of the Underlying Complaint alleges that Grand Development failed to fulfill promises made to unit owners about remediating Punch List Items and about the quality of the construction, materials, and workmanship of the Building.  *Id.*, Count III.

37.     Grand Development's failure to perform or correct items in a punch list is not an accident and therefore, not an "occurrence" as defined by the Policies.

38.     Further, the Association seeks to recover from Grand Development for: (1) Grand Development's failure to remedy the Punch List Items through a cause of action for breach of contract, (2) alleged deficiencies through a breach of warranty cause of action, and (3) promissory estoppel. Damages arising from a breach of contract or warranty, or from promissory estoppel, do not constitute an "occurrence" under the Policies.

39.     Finally, the Association seeks cost to repair or replace the defective roof, downspout, doors, windows, masonry, and building exterior. The items sought to be remedied qualify as Grand Development's own "work" and therefore, do not satisfy the Policies' requirement that the "property damage" be caused by an "occurrence."

40.     Nautilus has and had no duty under the Policies to defend Grand Development against the Underlying Complaint, or to indemnify it for any judgment or settlement entered in the *Association* Lawsuit.

41. An actual controversy exists between Nautilus, Grand Development, and the Association, and by the terms and provisions of 28 U.S.C. § 2201, this Court is vested with the authority to declare the rights and liabilities of the parties hereto and to grant such further and other relief as may be necessary.

WHEREFORE, Plaintiff, Nautilus, respectfully prays that this Honorable Court:

a. Determine and adjudicate the rights and liabilities of the parties hereto with respect to the Nautilus Policies;

b. Find and declare that the Underlying Complaint does not allege "property damage" caused by an "occurrence" as defined under the Policies;

c. Find and declare that Nautilus has and had no duty under the Nautilus Policies to defend Grand Development against the Underlying Complaint, or to indemnify Grand Development for any judgment or settlement entered in the *Association* Lawsuit; and

d. Grant Nautilus such other and further relief that the Court deems proper under the facts and circumstances.

## COUNT II
## NO COVERAGE UNDER THE 14-15 POLICY OR THE 15-16 POLICY

42. Nautilus adopts and realleges the allegations in Paragraphs 1 through 41 of its Complaint for Declaratory Judgment as and for Paragraph 42 of Count II of its Complaint for Declaratory Judgment as if fully set forth herein.

43. The 14-15 and 15-16 Policies, in relevant part, provide the following with respect to the liability coverage afforded therein:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**
* * *
**SECTION I- COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1. Insuring Agreement**

a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.

*  *  *

b.  This insurance applies to "bodily injury" and "property damage" only if:

(1)  The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2)  The "bodily injury" or "property damage" occurs during the policy period; and

*  *  *

44.  The Policies defines the term "property damage" as follows:

**SECTION V – DEFINITIONS**

*  *  *

**17.**  "Property damage" means:

a.  Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.  Loss of use of tangible property that is not physical injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

45.  The 14-15 Policy and the 15-16 Policy only afford coverage where "property damage" takes place during the policy period.

46.  The Underlying Complaint includes as an Exhibit, an October 29, 2020 letter from Tomasetti, which states that the Building is "a four-story mixed-use building constructed in 2017." Ex. A.

47. The 14-15 Policy and the 15-16 Policy expired before 2017, meaning there is no possibility that any "property damage" that may be alleged in the Underlying Complaint occurred during the policy period of those two policies.

48. Nautilus has and had no duty under the Policy to defend Grand Development against the Underlying Complaint, or to indemnify it for any judgment or settlement entered in the Underlying Complaint with respect to the 14-15 Policy or the 15-16 Policy.

49. An actual controversy exists between Nautilus, Grand Development, and the Association, and by the terms and provisions of 28 U.S.C. § 2201, this Court is vested with the authority to declare the rights and liabilities of the parties hereto and to grant such further and other relief as may be necessary.

WHEREFORE, Plaintiff, Nautilus, respectfully prays that this Honorable Court:

a. Determine and adjudicate the rights and liabilities of the parties hereto with respect to the Nautilus Policies;

b. Find and declare that the Underlying Complaint does not allege "property damage" occurring during the 14-15 Policy or the 15-16 Policy;

c. Find and declare that Nautilus has and had no duty under the Nautilus Policies to defend Grand Development against the Underlying Complaint, or to indemnify Grand Development for any judgment or settlement entered in the *Association* Lawsuit; and

d. Grant Nautilus such other and further relief that the Court deems proper under the facts and circumstances.

## COUNT III
## NO COVERAGE UNDER THE 16-17 POLICY OR THE 17-18 POLICY

50. Nautilus adopts and realleges the allegations in Paragraphs 1 through 49 of its Complaint for Declaratory Judgment as and for Paragraph 50 of Count III of its Complaint for Declaratory Judgment as if fully set forth herein.

51.     Coverage under the 16-17 Policy and the 17-18 Policy is subject to Exclusion j., which precludes coverage, in relevant part, for the following:

**j.    Damage To Property**

"Property damage" to:

**(1)**     Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)**     Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises.

52.     The 16-17 Policy and the 17-18 Policy do not afford coverage for "property damage" to property Grand Development owns, rents, or occupies.

53.     Grand Development owned each unit prior to selling it to a particular owner.

54.     The 16-17 Policy and the 17-18 Policy do not afford coverage for damage that occurred while Grand Development owned particular units.

55.     The 16-17 Policy and the 17-18 Policy also contain a Products Completed Operations Hazard Exclusion, added by an endorsement titled "Exclusion- Products-Completed Operations Hazard" (Form CG 21 04 11 85), which provides, in pertinent part, the following:

**EXCLUSION- PRODUCTS-COMPLETED OPERATIONS HAZARD**
* * *

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART.

This insurance does not apply to "bodily injury" or "property damage" included within the "products-completed operations hazard."

(Hereinafter, "PCOH Exclusion").

56.     The 16-17 Policy and the 17-18 Policy define the term "products-completed operations hazard" as follows:

**16.**     "Products-completed operations hazard":

**a.**     Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)**     Products that are still in your physical possession; or

**(2)**     Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a)     When all of the work called for in your contract has been completed.

(b)     When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c)     When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

* * *

57.     The 16-17 Policy and the 17-18 Policy define the term "your work" as follows:

* * *

**22.**     "Your work":

**a.**     Means:

**(1)**     Work or operations performed by you or on your behalf; and

**(2)**     Materials, part or equipment furnished in connection with such work or operations.

**b.**  Includes

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

**(2)** The providing of or failure to provide warnings or instructions.

58. The 16-17 Policy and the 17-18 Policy preclude coverage for "property damage" occurring away from premises Grand Development owns after completion of Grand Development's work.

59. Upon sale of a particular unit from Grand Development to an owner, any damage occurring to that unit would fall within the "products-completed operations hazard."

60. The Underlying Complaint seeks to recover from Grand Development for damage to the units that occurred after sale to unit owners by Grand Development.

61. Damage to a unit that occurred while Grand Development owned that unit is precluded by Exclusion j.

62. Damage to a unit that occurred after Grand Development sold that unit is precluded by the PCOH Exclusion.

63. The Underlying Complaint, therefore, does not allege the possibility of "property damage" covered by the 16-17 Policy or the 17-18 Policy.

64. Nautilus has and had no duty under the 16-17 Policy or the 17-18 Policy to defend Grand Development against the Underlying Complaint, or to indemnify it for any judgment or settlement entered in the *Association* Lawsuit.

65. An actual controversy exists between Nautilus, Grand Development, and the Association, and by the terms and provisions of 28 U.S.C. § 2201, this Court is vested with the authority to declare the rights and liabilities of the parties hereto and to grant such further and other relief as may be necessary.

WHEREFORE, Plaintiff, Nautilus, respectfully prays that this Honorable Court:

16

a.    Determine and adjudicate the rights and liabilities of the parties hereto with respect to the Nautilus Policies;

b.    Find and declare that the 16-17 Policy and the 17-18 Policy do not provide coverage for the *Association* Lawsuit because Exclusion j. and/or the PCOH Exclusion apply to preclude any possibility of coverage for any alleged "property damage";

c.    Find and declare that Nautilus has and had no duty under the Nautilus Policies to defend Grand Development against the Underlying Complaint, or to indemnify Grand Development for any judgment or settlement entered in the *Association* Lawsuit; and

d.    Grant Nautilus such other and further relief that the Court deems proper under the facts and circumstances.

## COUNT IV
## NO COVERAGE UNDER THE 18-19 POLICY

66.    Nautilus adopts and realleges the allegations in Paragraphs 1 through 65 of its Complaint for Declaratory Judgment as and for Paragraph 66 of Count IV of its Complaint for Declaratory Judgment as if fully set forth herein.

67.    The 18-19 Policy contains a Designated Operations Exclusion, added by an endorsement titled "Limitation of Coverage to Designated Operations" (Form L240 (06/07), which provides, in pertinent part, the following:

**LIMITATION OF COVERAGE TO DESIGNATED OPERATIONS**

\* \* \*

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is **added** to **2. Exclusions** of **Section I- Coverage A – Bodily Injury And Property Damage Liability, Coverage B – Personal And Advertising Injury Liability** and **Coverage C- Medical Payments:**

This insurance does not apply to "bodily injury", "property damage", "personal and advertising injury" or medical payments arising out of, or in any way related to, operations performed by any insured or any person or organization for whom any

17

insured may be legally or contractually responsible, unless such operations are "designated operations."

**B.** For the purpose of this endorsement, the following definition is **added** to the **Definitions** section:

"Designated operations" means only those operations performed by any insured that are described on the General Liability Coverage Part Declarations, the endorsements, or supplements of this insurance.

(Hereinafter, the "Designated Operations Exclusion").

68.     The 18-19 Policy's Declarations identifies "vacant condominium units" as the Business Description and "vacant buildings" as the classification.

69.     The 18-19 Policy also identifies the following premises in the Declarations: (1) 1649-59 W. Grand Ave., 1st. Floor, Chicago, IL 60622; and (2) 469 N. Paulina St., Unit 201, Chicago, IL 60622.

70.     By its plain terms, the 18-19 Nautilus Policy only affords coverage for the insured's operations performed on the first floor of 1649-59 West Grand Avenue and Unit 201 of 469 North Paulina Street, to the extent they are vacant.

71.     The Underlying Complaint does not allege property damage to the first floor of the Building or to Unit 201.

72.     The Designated Operations Exclusion applies to preclude coverage under the 18-19 Policy for the claims asserted in the *Association* Lawsuit.

73.     Nautilus has and had no duty under the 18-19 Policy to defend Grand Development against the Underlying Complaint, or to indemnify it for any judgment or settlement entered in the *Association* Lawsuit.

74.     An actual controversy exists between Nautilus, Grand Development, and the Association, and by the terms and provisions of 28 U.S.C. § 2201, this Court is vested with the

18

authority to declare the rights and liabilities of the parties hereto and to grant such further and other relief as may be necessary.

WHEREFORE, Plaintiff, Nautilus, respectfully prays that this Honorable Court:

a. Determine and adjudicate the rights and liabilities of the parties hereto with respect to the Nautilus Policy;

b. Find and declare that the Designated Operations Exclusion bars coverage under the 18-19 Policy for the Underlying Complaint;

c. Find and declare that Nautilus has and had no duty under the Nautilus Policy to defend Grand Development against the Underlying Complaint, or to indemnify Grand Development for any judgment or settlement entered in the *Association* Lawsuit; and

d. Grant Nautilus such other and further relief that the Court deems proper under the facts and circumstances.

## COUNT V
## THE "CONTRACTORS AND SUBCONTRACTORS" EXCLUSION BARS COVERAGE UNDER THE 18-19 POLICY

75. Nautilus adopts and realleges the allegations in Paragraphs 1 through 74 of its Complaint for Declaratory Judgment as and for Paragraph 75 of Count V of its Complaint for Declaratory Judgment as if fully set forth herein.

76. The 18-19 Policy contains a Contractors and Subcontractors Exclusion, added by an endorsement titled "Exclusion- Contractors and Subcontractors" (Form L282 (07/10), which provides, in pertinent part, the following:

### EXCLUSION – CONTRACTORS AND SUBCONTRACTORS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is **added** to **2. Exclusions** of **Section I – Coverage A – Bodily Injury and Property Damage Liability**, **Coverage B – Personal And Advertising Injury Liability**, and **Coverage C – Medical Payments**:

This insurance does not apply to "bodily injury", "property damage", "personal and advertising injury" or medical payments arising out of work performed by any contractor or subcontractor whether hired by or on behalf of any insured, or any acts or omissions in connection with the general supervision of such work.

\* \* \*

(Hereinafter, the "Contractors and Subcontractors Exclusion").

77.     The 18-19 Policy does not afford coverage for "property damage" arising out of work performed by a contractor hired by Grand Development or performing work on Grand Developments' behalf.

78.     The Underlying Complaint alleges that Grand Development served as the real estate developer for the Building, Igor Michin was the general contractor for the Building, and Grand Development warranted that the roof "is warranted by the roofing contractor […]."

79.      The 18-19 Policy's Contractors and Subcontractors Exclusion bars coverage for the claims and damages alleged in the Underlying Complaint because the Building was constructed using a general contractor and a roofing contractor.

80.     Nautilus has and had no duty under the 18-19 Policy to defend Grand Development against the Underlying Complaint, or to indemnify it for any judgment or settlement entered in the *Association* Lawsuit.

81.     An actual controversy exists between Nautilus, Grand Development, and the Association, and by the terms and provisions of 28 U.S.C. § 2201, this Court is vested with the authority to declare the rights and liabilities of the parties hereto and to grant such further and other relief as may be necessary.

WHEREFORE, Plaintiff, Nautilus, respectfully prays that this Honorable Court:

a.      Determine and adjudicate the rights and liabilities of the parties hereto with respect to the Nautilus Policy;

20

    b.       Find and declare that the Contractors and Subcontractors Exclusion bars coverage under the 18-19 Policy for the claims asserted in the Underlying Lawsuit;

    c.       Find and declare that Nautilus has and had no duty under the Nautilus Policy to defend Grand Development against the Underlying Complaint, or to indemnify Grand Development for any judgment or settlement entered in the *Association* Lawsuit; and

    d.       Grant Nautilus such other and further relief that the Court deems proper under the facts and circumstances.

Dated this 15th day of September, 2022.

Respectfully Submitted,

/s/ Dana A. Rice
Dana A. Rice
Attorney for Plaintiff
*Nautilus Insurance Company*

Dana A. Rice (6283827)
Jeremy S. Macklin (6303870)
TRAUB LIEBERMAN STRAUS & SHREWSBERRY LLP
303 W. Madison St., Suite 1200
Chicago, Illinois 60606
(312) 332-3900 (t)
(312) 332-3908 (f)
drice@tlsslaw.com
jmacklin@tlsslaw.com